[Crim. No. 24735. Second Dist., Div. Five. Feb. 6, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK ALLEN BROWNING, Defendant and Appellant.

COUNSEL

Ruth Ohanessian, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and David R. Chaffee, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUS, P. J.—Defendant Frederick Allen Browning appeals from a judgment sentencing him to prison after he was convicted after a court trial of first degree murder, first degree robbery, first degree burglary (counts I, II, III), felony joy-riding (count V) and second degree burglary (count VI).[1]

## FACTS

The contentions on appeal relate solely to defendant's status as a juvenile—he was 17 years old when the crimes were committed—and to evidentiary questions concerning counts I, II, and III (murder, robbery, burglary).

## I

### *Juvenile Court*

In March 1973, a petition was filed in juvenile court charging defendant and one James Freeman with armed robbery and murder in the course of the robbery. These charges formed the basis for counts I, II and III. After defendant and Freeman were ordered detained, a hearing was held to determine defendant's fitness to be treated as a juvenile.[2] The juvenile court commissioner was aware of the petitions alleging the offenses that turned out to be counts V and VI.

---

[1]The case involves three consolidated informations. Defendant was acquitted on count IV, after a motion to dismiss (Pen. Code, § 1118).

[2]Freeman was declared fit to be treated as a juvenile at the detention hearing.

The probation officer's report revealed a history of about 25 previous contacts with law enforcement authorities, resulting in various dispositions. Defendant was on juvenile probation, and had "been through all of the programs that juvenile probation has to offer." The probation officer, in effect, recommended that defendant be prosecuted as an adult.

The juvenile court found that defendant was not a fit and proper subject to be dealt with under the provisions of the Juvenile Court Law, and ordered the district attorney to prosecute defendant as an adult under the Penal Code.

Details of the juvenile court proceedings will be added in the discussion.

## II

### *Murder, Robbery, Burglary*

To place in perspective defendant's challenges to evidentiary rulings in connection with counts I, II and III, we briefly note the evidence presented against defendant at the trial.

On December 22, 1972, at about 9 p.m., Linn Searles was robbed and killed in his store, the Magic Wand, in Pasadena. Searles' wife, who was working downstairs in the store when the events occurred, heard someone say, "I will take all that," heard a crash and several shots, and ran upstairs to find her husband dying. She called the police. A .38 caliber revolver was found at the scene, probably the victim's own gun. Searles had been shot with a .22 caliber gun.

A man who lived near the store discovered the victim's wallet several days later and turned it over to the police. A man passing the store at the time of the robbery testified[3] that he was stopped at an intersection when he heard shots, looked across the street towards the Magic Wand store, and saw two men run from the store. He described the men as black, wearing dark clothing, between 5'8" and 5'10", wearing naturals, about 17 or 18 years of age, and thin. Defendant "might" have been one of the boys he saw running from the store.

Charles Lymon, a friend of both defendant and Freeman—tried, as

---

[3]The parties stipulated that the witness' testimony at the preliminary hearing could be read at the trial, the witness being out-of-town.

noted, as a juvenile—testified that he, defendant and Freeman were just "riding around" on the night of the robbery when they reached the vicinity of the Magic Wand Store. Freeman said that the store was a good place to "hit." Defendant and Lymon refused, but then defendant said okay. Lymon let defendant and Freeman out of the car near the store. They wanted him to wait, but he refused. He then drove around the block and saw defendant, Freeman and a Caucasian man inside the store. Lymon saw no weapons.

Police Officer Long testified that he tape-recorded a conversation between defendant and Freeman while they were in custody in adjoining jail cells on the murder charge. Freeman said, in substance, that the police knew everything, that they knew that he and defendant had been in a blue car and that Lymon had driven off. Both Freeman and defendant discussed the fact that the victim wore a shoulder holster—information known only to the police.

Officer Long also testified that he spoke to defendant in jail, after advising him of his *Miranda* rights. Defendant, who lived in Pasadena, first said that he was in Santa Ana when the murder occurred and then said that he was home taking a bath.

A tape-recorded conversation, discussed below, between Officers Long and Hyzy, and one Daniel Sherrod was read, in which Sherrod said that Freeman was talking about the murder and robbery and defendant was laughing or saying nothing.

## DISCUSSION

On his appeal defendant raises eight contentions. Six relate to the finding that he was unfit to be handled as a juvenile, the rest arise out of the criminal trial.

## I

### *Constitutionality of Section 707*

Welfare and Institutions Code, section 707 provides, as relevant, that when a petition is filed alleging that a person under 18 years of age has violated any law or ordinance, and the minor was 16 years of age or older when the offenses were allegedly committed, "when substantial evidence has been adduced to support a finding that . . . the minor would not be

amenable to the . . . program available through . . . the juvenile court," the "court may make a finding noted in the minutes of the court that the minor is not a fit and proper subject to be dealt with" under the Juvenile Court Law, and the court "shall direct the district attorney . . . to prosecute" the minor under the applicable criminal law. "[T]he offense, in itself, shall not be sufficient to support a finding that such minor is not a fit and proper subject" to be dealt with as a juvenile.

■ Defendant contends that the statute is unconstitutionally vague, because it does not provide meaningful standards for the exercise of judicial discretion. This contention was resolved against defendant recently in *Donald L.* v. *Superior Court,* 7 Cal.3d 592, 601 [102 Cal.Rptr. 850, 498 P.2d 1098]. Yet, defendant contends that he does not intend to resurrect the arguments of *Donald L.*

Rather, he wishes to focus on an issue not discussed in *Donald L.:* where a minor has been found to be a ward of the court under section 602, the resources available to the juvenile authorities are coextensive with those available to the Adult Authority, including transfer to an Adult Authority institution (Welf. & Inst. Code, §§ 731, 1753). The only meaningful distinction between treatment as a juvenile offender and treatment as an adult is therefore that the jurisdiction of the juvenile authorities, in a case like this, expires when the juvenile would reach the age of 21. (Welf. & Inst. Code, § 1769.)[4] Since it is difficult for experts to estimate precisely the time needed for rehabilitation (see generally, *Jimmy H.* v. *Superior Court,* 3 Cal.3d 709, 715 [91 Cal.Rptr. 600, 478 P.2d 32]), it follows that any attempt by a court to estimate the time needed to rehabilitate a juvenile offender, necessarily permits "unbridled exercise of judicial authority."

We disagree. *Donald L.,* in holding section 707 constitutional, discussed and relied on *Jimmy H.,* (see 7 Cal.3d at p. 601), which spoke with confidence of the very infirmity cited by defendant—the ability to estimate the length of confinement needed. (3 Cal.3d at pp. 714-715.)

## II

### Abuse of Discretion

Defendant next contends that the juvenile court applied improper

---

[4]Absent the initiation of special proceedings to continue to confine dangerous persons. (*Welf. & Inst. Code,* § 1800.)

criteria in determining that he was not "a fit and proper subject" to be dealt with under juvenile law. Defendant more or less concedes that the time required to rehabilitate a juvenile offender is a proper consideration in determining whether the offender is unfit to be treated as a juvenile. (*Jimmy H. v. Superior Court, supra,* 3 Cal.3d 709, 715.) He claims, however, that the juvenile court's determination was based on misapprehension and ignorance of the law: first, the court's concern that sections 607 and 1769 would be construed to terminate juvenile court jurisdiction at age 18:[5] and second, the juvenile court's belief that if defendant were convicted as an adult, he could nevertheless be committed to the Youth Authority and kept under its jurisdiction until his 25th birthday under section 1771 of the Welfare and Institutions Code—a belief contrary to the provisions of section 1731.5, subdivision (b) of that code, if defendant were found guilty of the crimes alleged in the juvenile court petition.

If in fact the juvenile court had relied chiefly upon an erroneous belief concerning defendant's possible treatment as an adult offender, or on the court's concern that sections 607 and 1769 would be construed to read "18 years," rather than 21 years, defendant's contention would be viable. (See *Jimmy H. v. Superior Court, supra,* 3 Cal.3d 709, 712, 716.) However, the record does not support his position.

The matter of defendant's fitness was submitted to the court on the basis of the testimony of Mrs. Searles and Lymon, given at the pre-detention hearing; statements made by defendant's father, defendant's entire juvenile court file and the probation officer's report mandated by section 707. That report reviewed defendant's many contacts with the police and the juvenile court system—about 25 since May 1966. It related that all "efforts to rehabilitate the minor to the community have been to no avail since he obviously has continued his delinquent behavior." Further: "It is this officer's opinion that at this point minor is badly in need of a long term psychotherapy and a readjustment program that could best be obtained through the adult courts rather than the limited programs available in the juvenile correction system." It observed that "obviously minor has shown little if any positive progress while under probation supervision. . . . While

---

[5]Welfare and Institutions Code, section 607 provides that the juvenile court may "retain jurisdiction" over a person found to be a ward or dependent child until that person "attains the age of 21 years." Section 1769 provides that—absent section 1800 proceedings—every person committed to the Youth Authority by the juvenile court shall be discharged after two years or when the person "reaches his 21st birthday, whichever occurs later." (See generally, *In re Gary W.,* 5 Cal.3d 296, 300 [96 Cal.Rptr. 1, 486 P.2d 1201]; *In re Herrera,* 23 Cal.2d 206, 208 seq. [143 P.2d 345].)

minor maintained a good attitude toward the probation officer and was always affable . . . minor is very sophisticated at 'playing the game' and can adequately play any role that he feels is necessary."

After argument, the following ensued:

"THE COURT: I have read his entire file. Every probation officer's report and every clinical study, and you know, it really does seem that whoever decided to remove him from Camarillo and place him in Mrs. Freeman's home last year, that that decision is so grossly stupid that it really gives me some concern that when he was in Camarillo only after a month, and they are talking for months and months here, that if he doesn't shape up and he doesn't make it in Camp Rio, then they are going to send him to the Youth Authority.

"He leaves Camarillo without permission—I mean, he left on a weekend visit with permission, but then he didn't go back, and the probation officer lets him go live with Mrs. Freeman.

"I read his reasoning for it, and I just find it incomprehensible.

"In other words, I am saying I don't find everything to be [his] fault. At the same time, you take a look at this, and he has been on probation for five years. I mean, five years is a long time.

"Unless I am mistaken, he has some other Petitions here alleging burglary and auto theft, which is just practically the same thing that brought him to the Court's attention in June of 1968.

"I have some concern because, you know, the law now makes Minors, when they become 18, adults, and I have some serious question as to whether the Youth Authority can maintain a Minor past the age of 18 if he is committed from Juvenile Court.

"I don't feel a period of commitment from our court for something on the order of less than a year would come anywhere near to handling, being able to handle his problems.

"The probation officer seems to indicate that they believe he is in need of a long-term period of counseling in psychotherapy. That can be obtained through the adult court.

"It doesn't mean they are going to put him in State Prison if he is tried as an adult. I suppose it is a possibility. I don't conceive of it as a realistic possibility.

"He could be committed to Youth Authority from the adult court, and they would have a longer period of time to hold him.

"I am considering the offense and so you assume for the purpose of these hearings, at least I do, that he committed the offense and that he is guilty of it, otherwise there wouldn't be any point in trying to see why we would take any other measures.

"In other words, if you just say we are just going to consider his previous record and not consider the offense, that wouldn't make any sense. I mean, if you were here for a petty theft, I would say, well, for heavens sake. A petty theft. We are not going to certify someone to adult court for petty theft.

"Go ahead.

"[DEFENSE COUNSEL]: . . . .

". . . . . . . . . . . . . . . . . . . . . . .

"I think that even though the status of juvenile in terms of age and the Youth Authority hasn't been determined yet.

"I do believe that he still would be the subject of Juvenile Court jurisdiction even though he is past the age of 18.

"THE COURT: I have some serious questions about that, personally, but what I am saying is this, in this case it is obvious to me that probation is not effective in handling this Minor's case. . . .

". . . Let the record reflect the Court has read and considered the probation officer's report and receives it into evidence as well as I indicated that I have read every probation report and clinical study in the Minor's file.

"The Court finds the Minor is not a fit and proper subject to be dealt with under the provisions of the Juvenile Court law, . . . ."

■ As noted, defendant's point is that the juvenile court was influenced by twin misapprehensions: first, that in spite of the express language of sections 607 and 1769 of the Welfare and Institutions Code, the Youth Authority would not be able to maintain jurisdiction over defendant beyond his 18th birthday; and, second, that there was a possibility—albeit not "realistic"—that if defendant were tried as an adult, he could be committed to the Youth Authority in spite of the limitations of section 1731.5, subdivision (b) of the code.

The court did not spell out the reasons for its doubts concerning the Youth Authority's ability to keep defendant beyond his 18th birthday if he were to be committed as a juvenile. From the quoted portion of the record, it appears the court was thinking about chapter 1748 of the Statutes of 1971 (see *Donald L. v. Superior Court, supra,* 7 Cal.3d 592, 595, fn. 4).[6]

This is no occasion to decide whether that statute, in spite of express language to the contrary, affects the Youth Authority's ability to keep a minor beyond his 18th birthday.[7] We assume for the sake of argument that the court's doubts had no basis in law.[8]

Undeniably, this case bears a surface resemblance to *Jimmy H. v. Superior Court, supra,* 3 Cal.3d 709. There the juvenile court found the minor unfit under section 707 for the stated reason that the Youth Authority would be unable to detain him beyond his 21st birthday because the provisions of Welfare and Institutions Code, section 1800 et seq., permitting further detention, were probably unconstitutional. Being

---

[6]What puzzles us on that point is that when juvenile court jurisdiction over Freeman, defendant's accomplice, was retained, the court gave as one of its reasons that the Youth Authority would be able to keep him for seven years—clearly beyond his 18th birthday. That statement was, however, made about three weeks before defendant's fitness hearing.

[7]Chapter 1748 of the 1971 Statutes contains about 70 sections amending various code provisions, generally by lowering age limits from 21 to 18. Section 1 is a catch-all provision effecting such a lowering "in any provision of law," expressly excepting, however, "the provisions relating to the sentencing and commitment of persons to the Department of the Youth Authority, . . ."

[8]We do not assume that the court was necessarily wrong when it speculated on a remote possibility that defendant might be committed to the Youth Authority if tried as an adult. Although section 1731.5 of the Welfare and Institutions Code permitting such a commitment does not apply to defendants sentenced to life imprisonment, it was not inconceivable that as a result of a plea bargain or for other reasons—such as diminished capacity—defendant, though found guilty, would not receive a life sentence. If defendant were to be committed to the Youth Authority after a criminal trial, he could have been kept under its authority until his 25th birthday. (Welf. & Inst. Code, § 1771.)

of that view, the juvenile court "did not completely review petitioner's case and admittedly declined to fully consider all the facts involved in the incident on which the petition was founded." (*Id.* at p. 716.) The Supreme Court therefore directed the juvenile court to consider Jimmy H.'s fitness for treatment as a juvenile on the merits.[9]

*Jimmy H.* differs from this case in one vital respect: in spite of the juvenile court's unfortunate theorizing about the effect of chapter 1748 of the Statutes of 1971, the record demonstrates that the court considered all of the relevant evidence before it. It expressly recited that it had read defendant's entire file. Further, it is clear that it concurred with the conclusion of the probation officer that defendant needed a "long-term psychotherapy and a readjustment program" which was obtainable through the "adult courts" and not through the "limited programs available in the juvenile correction system." Reading the court's remarks as a whole and keeping in mind our duty "to place [on them] the most charitable interpretation possible" (*People* v. *Dickerson,* 273 Cal.App.2d 645, 650 [78 Cal.Rptr. 400]; cf. *People* v. *Risenhoover,* 70 Cal.2d 39, 57-58 [73 Cal.Rptr. 533, 447 P.2d 925]) we are convinced that the court's views on the possible effect of chapter 1748 had nothing to do with its ultimate disposition. Instead, it followed the mandate of *Jimmy H.* that it consider defendant's behavior pattern as described in the probation report, the nature and circumstances of the crime allegedly committed, his past record and his degree of sophistication as related to criminal activities. (3 Cal.3d at pp. 715-716.) There was no error.

### III

### *Statement of Reasons*

■ Defendant contends that the juvenile court did not give an adequate statement of its reasons for declaring him unfit to be treated as a juvenile. We disagree. The juvenile court's full statement is set forth above. Even assuming that the relaxed standard of *People* v. *Yeager,* 55 Cal.2d 374, 387 [10 Cal.Rptr. 829, 359 P.2d 261],[10] relied on by the

---

[9]Significantly the Supreme Court refrained from resolving the juvenile court's doubts concerning the constitutionality of section 1800 commitment proceedings. Thus, if the new fitness hearing took place before July 7, 1971, when—with certain adjustments—section 1800 was held valid (*In re Gary W., supra,* 5 Cal.3d 296, 303 seq.) the juvenile court presumably ruled in much the same frame of mind as did the court in this case.

[10]*Yeager* held that a remand of the minor for resumption of criminal proceedings under former section 831 of the Welfare and Institutions Code, permissible if in all the circumstances of the case the interests of the minor and of society would be better served by the procedures available in the trial court, was sufficiently supported by an order made "For good cause appearing. . . ."

Attorney General, would not satisfy the requirements of *Kent* v. *United States* (1966) 383 U.S. 541, 561 [16 L.Ed.2d 84, 97, 86 S.Ct. 1045], that the juvenile court provide a "statement of the reasons," *Kent* specifically disclaims a requirement that the court should "necessarily include conventional findings of fact." All *Kent* requires is that the basis for the order be set forth "with sufficient specificity to permit meaningful review." The court's statement was adequate.

Defendant also contends that the court's recognition that the probation department had erred in the way it handled defendant, was itself a reason for refusing to certify him to be treated as an adult. The court, as quoted above, found "incomprehensible" and "grossly stupid" the probation officer's decision to allow defendant to live with the Freeman family as a foster child after he failed to return to Camarillo.

As we understand defendant's contention, if his unfitness derives in significant part from errors in judgment by the probation department —in defendant's case, a failure to confine him in a secure facility, thus permitting him to commit the offenses with which he was charged—that portion of the juvenile's conduct that might not have occurred had he been correctly treated by the juvenile authorities cannot be counted in determining his amenability to treatment as a juvenile.

The contention is untenable. ■ At the stage of the proceedings where the juvenile court must determine a minor's fitness to be treated as a juvenile, it can examine only what in fact exists—"the nature of the alleged crimes, the circumstances surrounding their commission . . . the minor's past record and lack of rehabilitation . . . ." (*Donald L.* v. *Superior Court, supra,* 7 Cal.3d 592, 600) and the minor's "amenability to treatment through the facilities available to the juvenile court, . . ." (*Jimmy H.* v. *Superior Court, supra,* 3 Cal.3d 709, 714.) The law recognizes no doctrine of contributory fault on the part of the authorities which would withdraw the charged crimes and their significance from judicial consideration.

## IV

### *Presumption of Fitness*

■ Defendant contends that a presumption of fitness to be tried as a juvenile exists, or should exist, in California. The question was raised but left undecided in *Jimmy H.* v. *Superior Court, supra,* 3 Cal.3d 709, 715, footnote 3.

Arguably, the language of section 707 suggests that a presumption of sorts exists in favor of treatment as a juvenile. The section states, as noted, that *"when substantial evidence has been adduced* to support a finding that the minor . . . would not be amenable" to treatment through juvenile court facilities, the court may find that the minor is not a fit and proper subject to be dealt with as a juvenile. (Italics added.)

We do note that whatever the nature of the presumption of fitness may be, the People did more than just go forward with proof of unfitness: their evidence obviously persuaded the juvenile court. In fact there is very little, if any, proof of fitness, the presumption itself not being evidence. (Evid. Code, § 600, subd. (a).)

Defendant contends, however, that the requirement that the People present evidence that a minor is unfit to be treated as a juvenile, based on the considerations set forth above, is not sufficient. The People should be required to negate the possibility that treatment through the juvenile court system would be possible. Thus, in this case, the People would be required to demonstrate affirmatively that none of the various treatment options available through the juvenile court system and the Youth Authority would be adequate to serve the minor's needs and the best interests of society.[11] We do not believe that the state is required to bear so heavy a burden before the juvenile court can determine that a minor is unfit to be treated as a juvenile. Certainly nothing in our Supreme Court's discussions of the standards in determining fitness suggests such an intent. (See, e.g., In *Donald L., supra,* 7 Cal.3d 592, 600-601; *People* v. *Smith,* 5 Cal.3d 313, 317-318 [96 Cal.Rptr. 13, 486 P.2d 1213]; *Jimmy H.* v. *Superior Court, supra,* 3 Cal.3d 709, 715-716.) In brief, we adhere to the scope of review and standards set forth in the cases discussed above.

V

*Substantial Evidence*

We can briefly dispose of defendant's contention that there was no substantial evidence to support a finding that he was not amenable to treatment as a juvenile. Basically, this submission is a recasting of the contentions discussed above. The probation officer stated that defendant had "been through all of the programs that juvenile probation has to offer." Defendant's numerous contacts with law enforcement authorities

---

[11]We must assume that the juvenile court was aware of the treatment options it had at its command. Impliedly it found none to be adequate.

since 1966—the offenses charged, it is to be remembered, occurred in 1972—his pattern of running away when confined, his failure to respond to placements and probation, constitute sufficient evidence to support the juvenile court's finding that he was not suitable for treatment as a juvenile.

Finally, contrary to defendant's contention, the juvenile court is not required to determine precisely how long a long-term psychotherapy and a readjustment program will take. ▓ In *Jimmy T.* v. *Superior Court, supra,* 3 Cal.3d 709, 715, the court stated that if the "possibility that the Youth Authority might have to treat a ward of the juvenile court beyond the age of his majority is the determinative factor in the court's decision that the minor is unfit, there must be substantial evidence in the record that successful treatment might require the extra time." However, the substantial evidence need not be specifically quantified: in *Jimmy H.,* two doctors and a probation officer concurred that the juvenile would require treatment for a "sustained period"; one of the doctors did not " 'even have an educated guess' " as to the time required. The court noted: "No evidence was adduced at the hearing that petitioner [the minor] in four years would positively be a physical danger to society because of a mental or physical deficiency, disorder or abnormality. However, such opinion evidence is not essential for the juvenile court to conclude that a minor is not fit." (3 Cal.3d at p. 715.)

In brief, the juvenile court did not abuse its discretion in declaring defendant unfit to be treated within the juvenile court system.

## VI

### Motion to Set Aside Information

At defendant's preliminary hearing, he made a motion to dismiss the proceedings on the grounds that the juvenile court order was improper. The magistrate denied the motion, apparently agreeing with the People that the correctness of the juvenile court's order was not properly before him. The effort to have the section 707 finding of unfitness set aside was renewed in the superior court, defendant's theory being that because of the alleged infirmities in section 707—as enacted and as applied—he was not "legally committed." (See generally, *Jennings* v. *Superior Court,* 66 Cal.2d 867, 874-875 [59 Cal.Rptr. 440, 428 P.2d 304].)

We could dispose of this point by simply stating that it is moot

because—if we are right so far—none of the alleged infirmities exists. Nevertheless the point of the magistrate's and the superior court's power to set aside the juvenile court's section 707 order is so earnestly argued and there is so little direct authority on it, that it is proper for us to dispose of it.[12]

It would be entirely inappropriate for a magistrate to question the validity of a juvenile court's finding of unfitness under section 707. How a grand jury would even start to go about it, we cannot imagine. ■ Clearly then a motion to set aside an indictment or an information made under section 995 of the Penal Code could not reach an improper or invalid juvenile court order.

Quite apart from these procedural niceties, it would not be in the interest of speedy and orderly administration of criminal justice to sanction an additional avenue of review of juvenile court orders under section 707, by holding that the superior court has some nonstatutory power to dismiss on the ground that it thinks the juvenile court acted illegally. (Cf. *People* v. *Sanchez,* 21 Cal.2d 466, 471 [132 P.2d 810].) In case of continued disagreement we would eventually be called on to arbitrate the squabble. No such detour to this court is called for. The law seems plain enough. ■ Although a finding of unfitness is not appealable (*In re Brekke,* 233 Cal.App.2d 196, 199 [43 Cal.Rptr. 553]), it is reviewable by writ. (*Donald L.* v. *Superior Court, supra,* 7 Cal.3d 592, 595; *Jimmy H.* v. *Superior Court, supra,* 3 Cal.3d 709, 713; *Bruce M.* v. *Superior Court,* 270 Cal.App.2d 566 [75 Cal.Rptr. 881]; *Richerson* v. *Superior Court,* 264 Cal.App.2d 729 [70 Cal.Rptr. 350].) Further, the People do not question that such a finding may be reviewed on an appeal from an ensuing criminal conviction. Two avenues of review are enough.

## VII

### Prior Inconsistent Statements

■ On January 23, 1973—that is, about a month after the robbery and homicide—Police Officers Long and Hyzy interviewed one Daniel Sherrod at the Pasadena Police Department. Sherrod told the police

---

[12]The People rely chiefly on *People* v. *Machado,* 150 Cal.App.2d 190, 196 [309 P.2d 903]. That case is not as persuasive as they argue, since no part of the juvenile court proceedings except the finding of unfitness was before the lower court. Strictly read *Machado* simply holds that the finding was all that was necessary to confer jurisdiction on the superior court. It did not say what powers that court had in exercising it.

officers that he was riding around in "Jerry's" car with defendant and James Freeman—charged, as noted, with the same offenses in juvenile court—and that Freeman described the robbery and killing at the Magic Wand, which he and defendant had committed. When Freeman was telling the story, defendant was just "sitting back there and being quiet," and "laughing and stuff." When asked if he would testify in court, Sherrod said, "I'd be endangering my life."

At the preliminary hearing, Daniel Sherrod was a very hostile witness. He denied making the statements attributed to him, admitted making them but claimed the statements were coerced, could not remember what he said, and agreed that he might have said anything to get the police off his back. The tape recording of the interrogation of Daniel Sherrod was played at the preliminary hearing. By the time of trial, Daniel Sherrod could not be located; it is undisputed that the prosecution exercised all due diligence in attempting to locate him. Accordingly, relevant parts of Sherrod's testimony at the preliminary hearing were read into the record.

This reading of Sherrod's testimony at the preliminary hearing—quite futile, standing alone—was preliminary to introducing into evidence the transcript of the tape conversation between Officers Long and Hyzy and Sherrod. Defense counsel objected vigorously and at length on all the grounds that we will discuss. The tape transcript of the conversation was, nevertheless, read into the record, and was used by the People for the truth of the matters stated therein.

Evidence Code, section 1235 provides that evidence "of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing . . . ." ▮ Section 1235 does not deny a defendant his right "to be confronted with the witnesses against him" under the Sixth Amendment to the United States Constitution. (*California* v. *Green* (1970) 399 U.S. 149, 150-151, 164 [26 L.Ed.2d 489, 492-493, 500, 90 S.Ct. 1930]; *People* v. *Green*, 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998].)

Since the United States Constitution is foreclosed to defendant, he contends that section 1235 is inconsistent with the California constitutional right of confrontation. The argument is made tentatively, and with good reason: at the time of the proceedings in this case, and when defendant's brief was filed, the California Constitution contained no "confrontation" clause. (See Cal. Const., art. I, § 13.) This surprising

omission from a document that generally does not suffer from underinclusiveness, was rectified at the November 1974 election with the passage of Proposition 7. (Cal. Const., art. I, § 15, eff. Nov. 6, 1974.) The California model of the confrontation clause reads as follows: "The defendant in a criminal cause has the right . . . to be confronted with the witnesses against the defendant." The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." We have no reason to believe that these nearly identical clauses will be interpreted differently, or that any such different interpretation will be given a retroactive effect.

## VIII

### *Evidence Code, section 1221*

Defendant contends that, even if section 1235 is constitutional, the People failed to lay a proper foundation for the use of Freeman's statements against defendant under Evidence Code, section 1221. This section provides that evidence of a statement "offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

Defendant contends that the People did not establish that he actually heard Freeman's statements about the robbery, that the statement was such as to call for an answer, that he was free to object to or deny the statement, and that his conduct—laughter and failure to protest—was intended as a response.

Defendant is mistaken. These preliminary matters turned on questions of fact, which, as defendant points out, were questions to be decided by the trial court. (*People* v. *Briggs,* 58 Cal.2d 385, 408 [24 Cal.Rptr. 417, 374 P.2d 257].) The trial court could properly infer that defendant heard Freeman's statements, understood their import, had the opportunity to deny them, and that he chose not to do so because they were true. (See *People* v. *Preston,* 9 Cal.3d 308, 313-314 [107 Cal.Rptr. 300, 508 P.2d 300].)[13]

Defendant points out that laughter, rather than suggesting agreement

---

[13]Since defendant was tried without a jury, there is no issue with respect to the question whether these preliminary matters are covered by section 403 or section 405 of the Evidence Code.

with the statements, more naturally indicates that the listener thinks the statements are preposterous. He also argues out that in the ghetto culture in which he lived the "natural reaction of an innocent man" (*People* v. *Simmons*, 28 Cal.2d 699, 712 [172 P.2d 18]) would be to remain silent, to laugh, or even to claim falsely that he participated in a crime. Since we cannot say, as a matter of law, that laughter does not indicate acquiescence, or that in the ghetto culture it would be unnatural to deny participation in a crime, we are bound by the ruling of the trial court.

 Defendant contends that Sherrod's statements to the police officers were inadmissible because Sherrod was under an illegal arrest when he made them. Defendant has no standing to raise the issue of the lawfulness of Sherrod's arrest, with respect to voluntary statements made by Sherrod. (*People* v. *Varnum*, 66 Cal.2d 808, 812-813 [59 Cal.Rptr. 108, 427 P.2d 772]; *People* v. *Wong*, 35 Cal.App.3d 812, 824-825 [111 Cal.Rptr. 314]; see *People* v. *Johnson*, 70 Cal.2d 541, 553 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].)

 Defendant next contends that Sherrod's statements to the police officers were coerced. He bases this contention on Sherrod's testimony at the preliminary hearing that he was willing to say anything to get the police off his back. Whether Sherrod's statements were coerced was a question of fact to be resolved by the trial court. (*People* v. *Lawler*, 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

The trial court's implied finding that Sherrod's statements were not coerced was supported by substantial evidence. Sherrod testified at the preliminary hearing that he was in pain from a leg wound and sedated; the police officers testified that he did not appear to be in pain or sedated; he certainly did not complain. The "coercion" claim boils down to whether Sherrod was lying during the police interview or lying at the preliminary hearing. Sherrod's statement that he would be "endangering" his life if he testified, coupled with his disappearance at the time of trial, would, without more, support a finding that after talking freely to the police, he became concerned about being labeled an informer, and, after using his best efforts to recant at the preliminary hearing, went even further to evade that label by failing to appear at all.

IX.

*Sentencing*

The reporter's transcript of the sentencing reveals the following.

Having denied a motion to commit defendant to the Youth Authority, the court announced:

"After due consideration, it is the judgment and sentence of this Court that as to Counts I, II, and III, Mr. Browning, that you are sentenced to State Prison for the term prescribed by law, concurrently under Section 654 of the Penal Code. [¶] As to Counts V and VII, [*sic*] you are sentenced to State Prison for the term prescribed by law. However, the sentences as to Counts V and VI, I mean, are stayed until completion of the sentence imposed on Counts I, II and III. Upon completion of which sentence, sentence on Counts V and VI will be stayed permanently.

" . . . . . . . . . . . . . . . . . .

"[Defense Counsel]: If I might speak with reference to Counts I, II and III. They are the same offense. It is my understanding that your Honor can sentence on one, but must suspend the execution of the sentences on Counts II and III until the sentence on Count I is carried out.

"THE COURT: No. I'm sentencing under Counts I, II and III as a single offense, staying the—that was my intention. I'm staying the sentences on Counts V and VI until completion of sentence under Counts I, II and III."

The court evidently confused counts II and III with counts V and VI. Actually, having decided not to commit defendant to the Youth Authority, it had run out of options. As far as counts I, II and III are concerned, section 654 of the Penal Code prohibited sentencing on more than one count, all crimes having arisen out of the same "transaction." On counts V and VI, the court was obliged to sentence defendant (Pen. Code, § 12; *In re Sandel,* 64 Cal.2d 412, 415 [50 Cal.Rptr. 462, 412 P.2d 806]; *People* v. *Morrow,* 275 Cal.App.2d 507, 514-516 [80 Cal.Rptr. 75]), but the punishment on count I being life imprisonment, section 669 of the Penal Code demanded that "the terms of imprisonment on the other convictions . . . shall be merged and run concurrently with such life term."[14]

---

[14]The court's stay of execution on counts V and VI was, in legal effect, a compliance with the prohibition against multiple punishment of section 654 of the Penal Code. (*People* v. *Niles,* 227 Cal.App.2d 749, 754-756 [39 Cal.Rptr. 11].) That section, however, prohibited punishment on counts II and III, not counts V and VI.

We can therefore correct the judgment without remanding the case for resentencing, and do so by modifying it to read as follows:

"It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the State Prison for the term prescribed by law on Counts I, V, and VI; all sentences shall run concurrently."

As so modified, the judgment is affirmed.

Stephens, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 2, 1975.