[Crim. No. 31640. Second Dist., Div. Two. Feb. 26, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
GENE LEBELL, Defendant and Appellant.

773

**COUNSEL**

Charles V. Weedman for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROTH, P. J.**—Appellant and Jack Ginsburgs were charged by information with the crime of murder, in violation of Penal Code section 187. By amendment adding a second count appellant was also charged as an accessory after the fact of the same crime, in violation of Penal Code section 32. Appellant's trial by jury was severed and he was acquitted on the murder charge but found guilty as an accessory. Probation was granted for a period of three years on condition appellant spend the first year in county jail. The appeal is from the judgment of conviction.

On July 22, 1976, Robert (Bobby) Hall together with Lawrence Mathes resided at 521 S. Mariposa in the City of Burbank. At some time between 10:30 p.m. and shortly after 11 o'clock Hall entered the kitchen of the house, Mathes heard a shot from that area and upon his own entry into the kitchen found Hall lying on the floor with a fatal gunshot wound in the head. Hall was a private investigator who had alienated various persons in connection with his work, among whom were his former friends Ginsburgs and appellant. Ginsburgs was convicted of the murder though evidence at the trial in the matter here considered was insufficient to directly implicate appellant in the commission of the crime. The evidence which supported the verdict of his guilt as accessory after the fact consisted of the testimony of John Egger, who was at the time of the killing, and until August 21, 1976, a captain in the Beverly Hills Police Department and a friend or acquaintance of appellant, the victim and Ginsburgs, and the contents of two tape-recorded interviews conducted surreptitiously by Egger with appellant on September 10, 1976; the first tape on the premises of a grocery market and the second the same day at appellant's home.

Egger's direct testimony bearing upon the conviction herein concerned a telephone call received by him from Ginsburgs on the night of the murder at about 11 p.m. wherein Ginsburgs admitted his guilt, as follows:

"A. I picked up the telephone and said, 'Hello.' And Mr. Ginsburgs' voice said, 'Taisho, I got the sonofabitch. I shot him right in the back of the head or the back of the neck. I just walked up the driveway and there he was in the kitchen, and I shot him.' And I said, 'You're kidding.' He said, 'No, I'm not.' I said, 'Why are you telling me?' He said, 'I thought you'd like to know.'

"He said, 'I'd like to see you tonight and talk to you in person.' And I told him that I was busy doing something for the police department and I would contact him later. And I heard Mr. Lebelle's voice in the background, a voice I recognize as Mr. Lebelle's—

". . . . . . . . . . . . . . . . . . .

"Q. (BY MR. BOWES): Did you hear Mr. Lebelle?

"A. Yes.

"Q. And in what way?

"A. Well, I heard him in the background, I remember definitely. But it's possible that I might have talked to him in that conversation. I really don't recollect whether I talked to him in that one or [sic] previous one or whether I really talked to him at all in either one of those conversation. [sic] But I did hear his voice in the second conversation. I asked—

"MR. COUGHRAN: I don't think—

"MR. WEEDMAN: I don't think any question is pending.

"Q. (BY MR. BOWES): Did you have any further conversation with Mr. Ginsburgs?

"A. Yes. I asked him where he was. And he said he was at Gene's. And I said, 'Well, I'll get a hold of you later.' That's essentially the conversation as I remember it at this time."

Egger likewise recounted a meeting with appellant "either Monday the 26th of July or the following Monday or the Monday after that" where Egger stated to him:

"A. I said, 'You know what I'm talking about. My family's been threatened over this Bobby Hall killing. You drove Bobby out there—' I

mean, pardon me, 'You drove Jack out there the night Bobby was killed, didn't you?' And Gene said, 'Uh-huh.' And then he said, 'Let's just forget about Bobby Hall. He's gone.' "

On September 10, Egger[1] met appellant at Ralph's Market in Studio City. He was equipped with a recording device and was acting as the undisputed agent or employee of the Burbank Police Department. Appellant was not in custody. After the conversation which, as noted, was tape recorded, a complaint was issued between 4:30 and 5:30 of the same afternoon charging appellant with murder and an arrest warrant was issued thereon. Much of the afternoon conversation was unintelligible and the reporter declined to attempt transcription.

At approximately midnight of the same day, Egger again visited appellant at his apartment. Appellant was still not in custody. Egger was wired for transmission of any conversation he would have with appellant and was accompanied by other police officers who were stationed outside

---

[1]Egger testified he had known appellant socially and otherwise for approximately 25-30 years and:

"A. No, . . . —at the beginning I met him, saw him a few times. Then I didn't see him for years.

"I did follow his sporting activities and various feats in the martial arts in newspapers and so forth. But, I didn't see him for years. And then I saw him infrequently and in the last two or three years I have seen him more often.

"Q. Did you see him at some particular location during the course of those two—past two or three years other than the locations that you have just indicated—his apartment and at the Beverly Hills Police Station?

"A. Yes.

"Q. Where was that?

"A. I saw him at the Olympic Auditorium where he took me to the wrestling matches or took my son and I into the wrestling matches.

"

"Q. How many times did you actually go to the wrestling matches and where you actually saw Gene Lebelle before July of 1976?

"A. Oh, that's hard to say again, maybe 20 times.

"Q. Did you ever go as his guest on those occasions?

"A. Yes.

"Q. How many of those occasions?

"A. To the best of my recollection, all of them.

"

"Q. I take it that Mr. Lebelle knew you as a captain of police of the Beverly Hills Police Department after August 21st, 1976, would that be correct?

"A. Yes.

"Q. Did you ever inform him that you had resigned from the Beverly Hills Police Department?

"A. Yes.

"Q. When was that, approximately.

"A. Well, just a day or two after the 21st of August."

It is clear from the record that Ginsburgs, appellant and Egger had a more than superficial acquaintance.

of the apartment. Egger's and appellant's second conversation[2] was heard by the officers and was also taped. At the conclusion of the conversation

---

[2]  (Voice 2 is that of appellant.)
"VOICE 2: —He has—He is completely one hundred and one percent, he says, like it should have been done. He told me that it was God's will.
"VOICE 1: That Bobby be—
"VOICE 2: That he did it. It's—It was God's will. He didn't have any—Any—I mean, it was—He—He—He felt a—
" . . . . . . . . . . . . . . . . .
(Voice 1 is that of John Egger.)
"VOICE 1: So he was actually sort of playing God or he felt that he was—
"VOICE 2: Yeah. He said that's what he felt. He felt like he was—He felt like that nobody else was going to handle the situation and that he was led. You know what I mean?
"VOICE 1: Yeah.
"VOICE 2: Now, the fact that maybe I'm [sic] When I, being a second party, and—And saying it, doesn't sound quite right. It—I'm not giving the thing that he was way out or spaced out, I'm just—
"VOICE 1: Yeah.
"VOICE 2: Now—I'm saying, as if he was talking, 'The boy deserved to be spanked. The principal of the school wouldn't do it, his parents wouldn't do it. I was chosen to do it.'
"VOICE 1: That's the way—
"VOICE 2: And—
"VOICE 1: —He feels about it, huh?
"VOICE 2: Yes. And with not a guilt. It's like he caught a boy stealing, you know, an apple and that he made him return it, whatever, and it's a good thing for society. And personally I think very much that it was a good thing for society.
"And I feel a tremendous loss, I really do, but because it's a waste, you know, it's a waste. But the man did not deserve to live because he was on the earth, the last couple of years to do harm to whomever he touched.
"VOICE 1: Yeah.
"VOICE 2: He couldn't stand rejection. And anybody that rejected him, he would make a point to nail.
" . . . . . . . . . . . . . . . . .
(Voice 2)
"It's business, you know.
"VOICE 1: Yeah.
"VOICE 2: You can't afford the loss. So, the long and short of it, I'll have to say what happened and what he did to me and a million little things. And how do you say 'Get off my back' without going out and risking beating the shit out of him and ending up in jail or something like that?
"VOICE 1: Yeah.
"VOICE 2: I have thought a million times of getting him alone, but not to kill him, to giving him a permanent injury where there was no witnesses.
" . . . . . . . . . . . . . . . . .
(Blackbeard is Jack Ginsburgs)
"VOICE 2: And, so, Blackbeard comes by and he says, 'Well, I've been planning this,' And I says, 'Well, leave me alone. Go to sleep.' You know?
"All right. And then he says, very calm, cool, collected, not drunk, not excited, he says, 'This, this, this, and this happened.' And he says, 'I've got his address. I got a map. I know exactly where it's at.' You know?
" . . . . . . . . . . . . . . . . .
"VOICE 2: I—It's how far you're pushed. Now you analyze this. When I got off that boat and got to the phone and find out it was Bobby Hall calling the answer service, in

the officers outside of appellant's apartment entered and arrested him. Appellant was not advised by Egger nor did he know that Egger was acting for the Burbank Police Department. The question posed is whether the midnight conversation of September 10-11 or the tape thereof is admissible.

■ Appellant contends the contents of the midnight tape should have been suppressed since the evidence was obtained in violation of appellant's right to counsel under the Sixth Amendment and/or under article I, section 15 of this state's Constitution. We agree. (*People* v. *Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203]; *People* v. *Isby* (1968) 267 Cal.App.2d 484, 489 et seq. [73 Cal.Rptr. 294]; *Brewer* v. *Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232]; *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. See also *People* v. *Duck Wong* (1976) 18 Cal.3d 178 [133 Cal.Rptr. 511, 555 P.2d 297].) The fact is that not only had suspicion for the crime of murder been focused on appellant at the time of the conversation, but he was by a filed complaint actually charged with commission of that crime. An adversary judicial process had been commenced against him as a defendant and he was entitled to counsel before the conversation was commenced.

In this connection we find persuasive the language of *Massiah* v. *United States, supra,* 377 U.S. 201, 204-206 [12 L.Ed.2d 246, 250]:

"Ever since this Court's decision in the *Spano* case, the New York courts have unequivocally followed this constitutional [377 US 205] rule. 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of

---

the—although I was as calm as I am now, I could just say I saw Bob there and I would have killed him. I always picture killing him by breaking his neck, you know, making him quiver.

". . . . . . . . . . . . . . . . .

"VOICE 1: Well, you know what is really intriguing to me is the physical part of this. I've gone to the range. I've been shooting in the mountains. I've been shooting everywhere. A .38 or whatever. He told me it was a .38 two-inch stainless. A 138 makes a lot of noise in residential neighborhood.

"VOICE 2: I didn't hear a thing.

"VOICE 1: How far away were you?

"VOICE 2: Not close.

"VOICE 1: A block or—

"VOICE 2: Half a block, maybe.

"VOICE 1: My God. That's fantastic because—

"VOICE 2: Because he just walked back to the car, huh? And said, 'Let's go.'

"VOICE 1: He just walked to the car. God, that guy is something else.

"VOICE 2: And I—(unintelligible)

"VOICE 1: Did he say he did?

"VOICE 2: I said, 'Well, what did you do?' He said, 'I shot him right in the head.'"

counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.' *People* v. *Waterman,* 9 NY2d 561, 565, 175 NE2d 445, 448.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. It is true that in the *Spano* case the defendant was interrogated in a police station, while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But, as Judge Hays pointed out in his dissent in the Court of Appeals, 'if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon . . . because he did not even know that he was under interrogation by a government agent.' 307 F2d at 72-73." (Fn. omitted.)

The complaint in the case at bench was the equivalent, for purposes of initiation of adversary judicial proceedings, of the indictment in *Massiah.* (*People* v. *Hannon, supra,* 19 Cal.3d 588.)

■ Appellant likewise urges error in the trial court's determination the presence of appellant during the time Ginsburgs confessed his guilt in his telephone call to Egger on the night of the murder was sufficient to support a finding of an adoptive admission by appellant which might in turn be considered by the jury in reaching its conclusion appellant was guilty of the crime for which he was convicted. We are, again, obliged to agree. While it is true that "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth" (Evid. Code, § 1221), it is likewise the case that, where, as here, the admissibility of evidence depends on the existence of a preliminary fact, the burden is upon the proponent thereof to establish such existence and that it is incumbent on the trial court to see such evidence is disregarded where the jury could not reasonably find that the preliminary fact exists. (Evid. Code, §§ 400-403.) Here Egger's testimony was to the effect only that he heard appellant's voice in the background while Ginsburgs made his incriminating statements and that Ginsburgs indicated he was in fact at

appellant's home. But there was nothing from which it could reasonably have been surmised appellant heard what Ginsburgs said or that, if he did, there was any reason or opportunity for him to respond to Ginsburgs' statements. Under the circumstances present, those preliminary facts were inadequately established and the proffered evidence of adoption should have been excluded. (Cf. *People* v. *Browning* (1975) 45 Cal.App.3d 125 [119 Cal.Rptr. 420].)

Such evidence as remained which could properly have been considered by the jury in arriving at its determination of appellant's guilt, while not such as we could conclude as a matter of law insufficient for that purpose, was nevertheless, when taken together with that which should have been rejected, not such as would permit us to conclude the errors discussed herein were harmless beyond a reasonable doubt or that it is reasonably probable the same result would have been reached if the errors pointed out had not been committed. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].) Accordingly, the judgment appealed from must be reversed.

Fleming, J., and Beach, J., concurred.

A petition for a rehearing was denied March 27, 1979, and respondent's petition for a hearing by the Supreme Court was denied April 26, 1979.