[No. A036286. First Dist., Div. Three. Nov. 30, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
VELMA HENDERSON, Defendant and Appellant.

[No. A036290. First Dist., Div. Three. Nov. 30, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILIP HENDERSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts IV, VI and IX.

Counsel

Eleanor M. Kraft for Defendant and Appellant in No. A036286.

Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, and Joel Kirshenbaum, Deputy State Public Defender, for Defendant and Appellant in No. A036290.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Laurence K. Sullivan and Linda James, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

MERRILL, J.—Appellants Philip and Velma Henderson were charged by amended information with four counts of first degree murder (Pen. Code, § 187),[1] two counts of robbery (§ 211), and one count of auto theft (Veh. Code, § 10851). Robbery-murder special circumstances were alleged in connection with the four murder counts (§ 190.2, subd. (a)(17)(i)). In addition, the information contained a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)) as to both appellants. Appellants pleaded not guilty to all counts and denied the special circumstance allegations.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Among the numerous pretrial motions filed by appellants was a motion to suppress evidence pursuant to section 1538.5 and a challenge to the jury selection system in the City and County of San Francisco, both of which were denied.

The court granted appellants' motions to sever their trials and Philip Henderson's trial was the first to take place. The jury convicted him of first degree murder of Raymond (Ray) Boggs, first degree murder of Andrea (Angie) Boggs, second degree murder of a fetus, voluntary manslaughter of Raymond Boggs, Jr., two counts of robbery and one count of auto theft. In addition, the multiple-murder special circumstance and two of the robbery-murder special circumstances were found to be true. During the penalty phase, the jury recommended a sentence of life imprisonment without the possibility of parole.

Following the jury trial of Velma Henderson, she was convicted of four counts of first degree murder as to the same victims involved in Philip's[2] trial, one count of robbery, one count of grand theft from a person and one count of auto theft. The jury also found the robbery-murder special circumstance with respect to the murder of Ray Boggs and the multiple-murder special circumstance to be true. At sentencing, upon defense motion, the court modified the verdict against Velma Henderson by reducing her first degree murder convictions on counts III and IV (in respect to Raymond Boggs, Jr., and the fetus) to voluntary manslaughter and second degree murder respectively. As to both Philip and Velma Henderson, the court imposed sentences of life imprisonment without the possibility of parole on counts I and II, the first degree murder convictions of Ray and Angie Boggs, with the sentence on count II to run concurrently. Sentences on the remaining counts were either concurrent or stayed. The appeals of Philip and Velma Henderson have been consolidated for purposes of our review.

I

The victims, Ray Boggs, Angie Boggs, and Raymond Boggs, Jr., lived in an apartment at 753 Webster Street in San Francisco. At the time of her death, Angie was carrying a 30-week-old fetus.

Ray Boggs was last seen alive on January 11, 1982. On that day he went to his job at a glass company in Redwood City and worked all day. Shortly before 5 p.m. he made a telephone call, received a salary advance and left for the day. The Boggses' landlord, Ilyas Absar, received a telephone call

---

[2] First names are used when necessary to distinguish between persons with the same surname.

from Angie Boggs on January 11, 1982. Angie had requested some help from Absar in connection with problems she had with another tenant. Absar had last seen Ray on January 8, 1982, when he collected a portion of the rent due.

In response to Angie's call, Absar went to the Boggses' apartment on January 13, 1982. No one answered the door. When he returned a few days later, he still could not locate the Boggs family. On January 25, Absar contacted Ray's employer who thought Ray had probably left town. Absar wanted to regain possession of the apartment. Upon the advice of an attorney, he posted a notice on the Boggses' apartment door, mailed copies of the notice to them and to their emergency contacts. He received no response to his notices.

On February 17, 1982, 18 days after posting the notice, Absar entered the apartment. He observed that the living room had the usual furniture and that the closet in that room contained clothes. However, the bedroom had no furniture and no clothes. Only a mattress lay on the floor. There were chairs and a table in the kitchen, but one of the chairs had been broken. Absar saw no signs of a struggle or fight. He found no money in the apartment.

Prior to this occasion, he had last been in the apartment in July 1981. At that time he had noticed a rifle hanging on the living room wall. The rifle was gone when he entered the apartment in February 1982.

Next to the telephone, Absar found what appeared to be a good-bye note to the Boggses. It stated something to the effect that they were sorry to have to leave like this but that is the way it was. Absar threw the note away.

On February 28, in cleaning up junk in the backyard of the apartment building, Absar came across the body of Ray Boggs wrapped in a rug or cloth. The back of the Webster Street apartment building was on stilts. There, underneath the Boggses' apartment, in an area which is exposed to the elements, he saw a large bundle. At first Absar thought it contained old clothes. He and a friend attempted to move it but it smelled so bad and it weighed so much that Absar realized it could not be clothes. Absar opened the bundle up a little and saw a person's upper arm. He called the police.

Dr. Boyd Stephens, Chief Medical Examiner for the City and County of San Francisco, conducted the autopsy. The body was in an advanced state of decomposition at the time of the autopsy. Ray Boggs's body had been wrapped in a blanket, sheet and pillows. He had been hog-tied, i.e., the hands were tied to the feet in the front. The obvious injury was a gunshot

wound to the forehead, with the bullet lodged in the brain. The bullet recovered from Ray's body was a .22-caliber round. There were ligature marks on the areas of the body which had been tied. The bullet had not penetrated any of the bedding wrapped around the body. It was Dr. Stephens's opinion that Ray had been shot in one location and transported later. The degree of decomposition observed was consistent with January 11 being the time of death.

Inspectors Napolean Hendrix and Earl Sanders were in charge of the Boggs homicide investigation. A few days after the discovery of the body, the inspectors learned that the decedent was Ray Boggs. The inspectors interviewed the neighbors in the apartment building, Absar, and Ray Boggs's employer, but failed to find any leads as to possible suspects in the homicide. However, the inspectors did learn from the neighbors or other witnesses that the Boggs family had been missing for six or seven weeks.

On March 19, 1982, the inspectors received a call that more bodies had been found at the 753 Webster Street location. In cleaning the backyard area, one of the residents of the apartment building came upon the bodies of Angie Boggs and Raymond Boggs, Jr., behind a headboard, in the filth and debris under the house. The police had not entered that particular part of the premises on February 28.

Angie's body had been wrapped in a blanket which one of the neighbors recognized as belonging to the Boggs family. She was wearing a nightie, panties and only one slipper. The autopsy revealed that Angie's body was in an advanced state of decomposition. A towel had been wrapped tightly around her neck and knotted on one side. Dr. Stephens determined Angie's death had been caused by asphyxiation, even though any ligature marks from strangulation had been destroyed by the decomposition process. He also was of the opinion that she had been killed in one location and transported to another.

Ray Boggs, Jr., was approximately one year old when he died. He too had been wrapped in a blanket and was in an advanced state of decomposition at the time of the autopsy. Although Dr. Stephens classified the death as a homicide, he could detect no apparent trauma and was unable to determine the cause of death. He testified as to the relative ease with which an individual could asphyxiate a small child.

The fetus carried by Angie at the time of her death was at approximately 30 weeks' gestation and viable outside the womb. In addition to analysis of physical developments of the fetus, Dr. Stephens determined the age of the fetus by comparison of X-rays taken during the autopsy with sonograms

taken during the course of prenatal care received by Angie. The last sonogram conducted upon Angie was on December 30, 1981, at which time the fetus was between 27 and 28 weeks of gestational age. In this case, information about the fetus's age aided Dr. Stephens in establishing the time of death for Angie. Dr. Stephens stated it was most likely that mother and child were killed approximately two weeks after December 30, 1981.

There was no visible sign of trauma to the fetus or to the uterus of the mother. Dr. Stephens concluded the fetus died because the mother died. He explained that shortly after the death of a mother, the oxygen supply to the fetus becomes inadequate and the fetus dies.

In conducting the investigation, the inspectors learned that among the items missing from the Boggses' apartment were Ray's rifle, a ring given to Angie by Ray for Christmas 1981, and Ray's green panel truck. Inspector Hendrix discovered the serial number of the rifle with the assistance of the Department of Alcohol, Tobacco and Firearms. The .22-caliber rifle had been purchased by Ray from a sporting goods store in Redwood City. Additionally, on March 20, 1982, the owner of a San Francisco jewelry store contacted the police in connection with the ring. After reading about the homicides in the newspaper, the store owner believed he might have sold the victim, Ray Boggs, a diamond ring just before Christmas 1981. The address on the receipt for the ring showed the 753 Webster Street address. The proprietor loaned Inspector Hendrix a duplicate of the ring. A friend of Ray's testified that Ray's father had given him the green truck and that Ray never agreed to let friends borrow it.

The inspectors requested from the telephone company the telephone records for the Boggs apartment, beginning with December 1981. After receiving the records, Inspector Hendrix noticed that the party billed for the Boggses' telephone was Philip Henderson. He did not recognize the name and thought it was another alias of Ray Boggs. The inspector knew that Ray Boggs had gone by the name Ray Martinez in the past.

Inspector Hendrix began calling all the long-distance and toll numbers listed on the record in order to speak with anyone who might know the Boggs family. On April 6, 1982, Inspector Hendrix called a number in Riverview, Florida, and spoke with Philip Henderson.[3] After informing Henderson that he was calling in connection with a homicide investigation, he asked whether he knew Ray Boggs. Henderson answered that he did know a Ray Boggs in Northern California, who had a wife or a girlfriend.

---

[3] The telephone conversation with Philip Henderson was admitted into evidence in his trial only.

He was not sure if Ray had a baby or whether he owned a green truck. Henderson stated that he stayed with the Boggses in January 1982 and that he left at the end of the first or second week of January and hitchhiked back to Florida. He also stated that, on Ray Boggs's request, he had deposited the money needed with the telephone company in order to obtain a telephone for the apartment.

Henderson told the inspector that another couple, named John and Pam, had also stayed with the Boggses. He stated that this couple had left some belongings behind which he placed in an area downstairs, the basement or the alley. Inspector Hendrix informed Henderson of Ray's murder and the location and manner in which the bodies were found. He then said, "I'm sure you're familiar with underneath the back stairs there." Henderson replied, "Yeah, the alleyway, God." He stated Ray had been a good friend.

Henderson also told Inspector Hendrix that he knew of one person, Jimmy, a big, fat Black man, to whom Ray owed money. Ray and Jimmy had an argument over the debt shortly before Henderson left San Francisco.

Finally, Henderson agreed to call back with more specific information about the date he left San Francisco or any other helpful information.

The following day Inspector Sanders called again and spoke to Philip's mother. He asked that Philip call him back. Philip returned the call and in that conversation, he recalled that he and his wife Velma left San Francisco on January 11, 1982, in the evening. Angie had left the apartment in the midafternoon with the baby and had not returned. Ray returned home from work, but left soon thereafter to look for Angie. Ray came home without Angie before the Hendersons left the apartment but then departed again.

In attempting to retrace the Hendersons' trip to Florida, the inspectors contacted the Reno, Nevada, police. Their investigation disclosed that on January 12, at 1:30 p.m., Philip Henderson had pawned Angie's missing diamond ring in Reno. In Carlin, Nevada, the inspectors located Ray's missing truck, which a man identifying himself as "Wayne Henderson" had sold to the owner of a garage in town. Also in Carlin, they spoke with a motel owner who identified the Hendersons as a couple to whom she had rented a room in January 1982 in exchange for a parrot. She stated that the couple related they were from San Francisco, had lost their home in a mud slide and were on their way to Florida. The truck they were driving needed some repair work and the motel owner told Philip Henderson about a garage in town.

The inspectors learned that in Salt Lake City, Utah, the Hendersons met a couple, Mark Koci and his girlfriend, with whom they spent three or four days. The couple gave the Hendersons a ride further east. Koci noticed that the Hendersons had in their possession a bolt action .22-caliber rifle. Some of the bullets for the rifle had cross cuts on top. Philip Henderson told Koci that they were on the run.

Inspectors Hendrix and Sanders arrested the Hendersons on April 29, 1982, near Tampa, Florida, and transported them separately to the United States Marshal's office for processing. In an interview immediately thereafter, Philip invoked his right to counsel and declined to answer any questions.

After being advised of her *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), Velma agreed to answer the inspectors' questions.[4] She stated that she and her husband moved in with the Boggs family before Christmas in December 1981 and left on a Monday in January 1982. While living there, upon Ray's request, Philip Henderson agreed to put up the cash needed to get a telephone for the apartment.

As Philip had stated in the telephone conversation, Velma said that Angie had left the apartment in the afternoon with the baby and did not return. Ray came home from work around 5 p.m., left a short while later, returned and then left again.

According to Velma, the Hendersons packed only a portion of their belongings, leaving the rest behind in the Boggs apartment. Philip wrote the Boggses a note. The two then took a bus to Berkeley where Philip had arranged for some people to pick them up. Velma did not recall the names of the man and woman but she stated they drove them straight through to Salt Lake City. Velma said she had just had a tooth pulled and was distracted because of the pain.

The Hendersons worked in a thrift store in Salt Lake City until they met another couple who took them to Wyoming. Velma could not recall their names. From Wyoming, they received a ride to Florida from a Keith Tolzac. Velma did not recall stopping in any other cities, including Reno or Carlin, Nevada. She knew that Philip had a rifle with him as they traveled across the country but she did not know where he got it or where it was at the time of the interrogation.

---

[4] Velma's statement was admitted into evidence at her trial.

Finally, Velma stated that Angie always wore the diamond ring Ray had given her. She also recalled that Ray had a green parrot which he had received as a gift from Angie.

While in Florida, the inspectors learned that Philip had sold the rifle to Tim Beladeau, an acquaintance in Riverview, Florida. Prior to 1982, Henderson and Beladeau had talked about altering bullets by marking around or across so as to shorten the projectile and increase its expanded capacity.

A criminalist testified that the bullet retrieved from Ray Boggs's brain was fired from a .22-caliber long rifle. The bullet had mushroomed and was deformed. The surface had been impacted and pushed back over the rest of the bullet. The expert could not positively identify the rifle taken from Beladeau as the one which had fired the bullet. However, the identifying characteristics of a bullet fired from the rifle were consistent with the characteristics found on the bullet which killed Ray Boggs. Additionally, the copper wash on the bullet recovered from Boggs was similar to the copper wash on the clips which were abandoned by the Hendersons in the backseat of Koci's car.

*Philip Henderson's Defense*

Philip testified in his own defense at his trial. He denied killing the Boggs family or being present when they were killed.

According to Philip, Velma and he had recently arrived in San Francisco when they met Angie at a Jack-in-The-Box restaurant on Market Street. They became friendly with the Boggs family. The Hendersons were residing at a hotel in the Tenderloin district and receiving general assistance from the county at the time. The Boggses asked them to move into the Webster Street apartment in order to share living expenses. The Hendersons moved into the Boggses' apartment on November 28, 1981.

Philip stated that the Boggses sold marijuana and cocaine out of their apartment and that "7th Street types," and "biker types" were often the customers. He also testified that a man called "Hawaiian Jimmy," accompanied by a large Black man, had a loud argument with Ray over a debt owed by Ray. Jimmy beat Ray over the head once or twice with his cane. Philip had heard that Jimmy was associated with a motorcycle group called the "Sons of Hawaii."

The Hendersons became frightened by the Boggses' drug business and by the violence. Before Christmas, they decided to leave and return to Florida

where Philip's mother resided. However, Ray asked them to stay a little while longer until he could find another couple to move into the apartment.

According to Philip, on January 11, 1982, he stayed home with Velma who was suffering with a toothache. Angie left the apartment at approximately 4:30 p.m. Ray returned from work at about 5:30 p.m. and then left to look for Angie. He returned an hour later and asked the Hendersons to help him in searching for her. They agreed and walked first to the Tenderloin district, where Angie, a former prostitute, had some contacts. They also searched the Jack-in-The-Box restaurant and some nearby bars, without any luck.

When they returned to the Boggses' apartment, they found things in disarray. No one was home. The lights were off, but the television was on. Ray's rifle was off the rack and leaning against the wall. His work shoes were next to the couch. Philip walked around the block and found Ray's green truck parked a block away. The Hendersons became frightened by the circumstances and decided this would be a good time to leave.

The Hendersons had little money so they decided to steal the Boggses' property. They took Ray's truck, his rifle, the gun pouch and clips, the parrot, and a jewelry box. The good-bye note they left behind, explaining that they were "skipping out" and upset about the "situation," was meant to refer to their leaving and the items they stole.

Philip admitted selling Angie's ring and providing a false address when he sold her ring in Reno. He also admitted telling false stories about being a victim of a mud slide in order to gain sympathy. In selling Ray's truck to the owner of a garage in Carlin, Philip lied that his brother had title and that he would mail it when he reached his brother's home back east. They also traded the parrot in Carlin for three night's lodging and $75. He kept the rifle. He denied altering the bullets but admitted having knowledge of how to do it.

From Carlin the Hendersons took a cab to Elko and then caught a train to Ogden and then Salt Lake City. He recalled meeting Koci and his girlfriend and receiving a ride to Wyoming. However, Philip denied telling Koci that he and Velma were in trouble.

As to his statements to Inspector Hendrix, Philip testified he lied because he did not want to be prosecuted for stealing Ray's truck or to be associated with the type of people involved in this case. After receiving the inspector's call, Philip informed Velma that as a result of the theft they might be suspects in the homicide investigation. He had no difficulty in lying to

Inspector Hendrix. He did not think the police would follow him across the country for an auto theft.

Edward Ramos, also known as Hawaiian Jimmy, testified for the prosecution on rebuttal. He admitted threatening Ray with physical injury and explained it concerned the failure to repay a debt. The two men had agreed to a trade; Ramos would work on Ray's truck in exchange for Ray fixing some windows. Ramos had performed his part of the bargain but Ray had not. Ramos attempted to collect the cash value of his work. He did receive a $50 check from Ray on January 7, 1982. A few weeks later he went to the glass company to collect the rest of the money owed. He did walk with a cane but denied ever hitting anyone with it.

*Velma Henderson's Defense*

Velma did not testify in her own defense at her trial and presented no witnesses.

## II

 Both Philip and Velma contend the trial court erroneously denied suppression of the evidence derived from the warrantless seizure of the telephone records for the Webster Street apartment. The appellants argue that at the time the records were obtained the inspectors should have known that the privacy rights of a couple other than the Boggses were in issue and therefore should have obtained a warrant. At the least, they submit that once the records were received and Philip Henderson's name was observed, the inspectors should have deferred further review until obtaining a warrant.[5] We find these arguments unpersuasive.

 On appeal of the denial of a section 1538.5 suppression motion all presumptions favor the trial court's exercise of its power as a finder of fact, and its findings, whether express or implied, will be upheld if they are supported by substantial evidence. The appellate court must also measure the facts, as found by the trier, against the constitutional standard of reasonableness. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

---

[5] Velma joins in this argument under the pre-Proposition 8 vicarious exclusionary rule. (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1]; see *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].)

At the suppression hearing, the following evidence was presented.[6] Inspector Sanders requested the telephone records for the Boggs residence in mid-March and obtained them on April 1, 1982. At the time the police investigation had revealed that all the known residents of the Webster Street apartment had been killed. The inspectors knew from the landlord that the Boggs family had rented the apartment. Absar and friends and relatives of the Boggses had advised the inspector of the telephone number for the Boggs residence. Inspector Sanders called the telephone company, advised them that an entire family had been murdered, provided them with the Boggses' name, the Webster Street address and telephone number and asked for the billing records. He did not obtain a warrant in order to receive the records. He then received a copy of the billing for the Webster Street apartment under the name "Phil W. Henderson." The inspectors did not know who this was. They thought it was an alias for Ray Boggs.

The inspectors had also received information about a couple who had been staying with the Boggs family. Some neighbors thought they were called John and Pamela Finch.

■ At the outset we note that as the offenses here occurred prior to June 8, 1982, we must analyze the validity of the suppression order under the law as it existed prior to the passage of Proposition 8. (See *People v. Smith*, *supra*, 34 Cal.3d at p. 258.)

■ The lawfulness of search and seizure under the California Constitution is determined by whether the person has exhibited a reasonable expectation of privacy and, if so, whether that expectation has been violated by unreasonable governmental intrusion. (*People v. Edwards* (1969) 71 Cal.2d 1096, 1100 [80 Cal.Rptr. 633, 458 P.2d 713].) Under article I, section 13 of the California Constitution, an individual has an expectation of privacy in a record of telephone calls made from his or her residence, however temporary. (*People v. Blair* (1979) 25 Cal.3d 640, 653-654 [159 Cal.Rptr. 818, 602 P.2d 738], citing *People v. McKunes* (1975) 51 Cal.App.3d 487 [124 Cal.Rptr. 126] [holding that reasonable expectation of privacy held by the telephone company subscriber].) In *Blair*, our Supreme Court found that a person had a reasonable expectation of privacy in a list of telephone calls made from a hotel room where he was a registered guest. (*People v. Blair*, *supra*, 25 Cal.3d at pp. 648, 653-654.)

■ Here, Philip had made no outward manifestation of his privacy expectation in the billing records, apart from paying the bill. Unlike the

---

[6] The parties stipulated that the preliminary hearing transcript would be admitted as evidence at the suppression hearing. Some additional evidence was also presented at the hearing.

hotel guest in *Blair*, Philip did not rent the Webster Street apartment and had not exhibited his expectation of privacy in the telephone records.

Further, the officer's actions in requesting the telephone records for this residence did not constitute an unreasonable governmental intrusion. ■ "As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate." (*People* v. *Block* (1971) 6 Cal.3d 239, 244 [155 Cal.Rptr. 430]; *People* v. *Newell* (1979) 93 Cal.App.3d 29, 37 [155 Cal.Rptr. 430].) In analyzing the reasonableness of the officer's actions, due weight must be given to the officer's reasonable inferences, drawn from the facts in light of his experiences. (*People* v. *Block, supra*, 6 Cal.3d at p. 244.)

For example, an officer's reasonable and good faith mistake of fact, entertained in connection with an arrested party's identity does not constitute an unlawful seizure. (*People* v. *Hill* (1968) 69 Cal.2d 550, 555 [72 Cal.Rptr. 641, 446 P.2d 521].) Further, a search of a defendant's premises is not invalidated by an officer's honest and reasonable factual mistake that a defendant was on parole. (*People* v. *Tellez* (1982) 128 Cal.App.3d 876, 880-881 [180 Cal.Rptr. 579].) "[F]rustration of purpose would result by the suppression of evidence obtained by officers who conduct themselves reasonably and properly under a state of facts which they justifiably believe to exist." (*Id.*, at p. 881.)

■ In the instant case, the officer's request for the telephone records, without a warrant, was not an unreasonable search. At the point in time when the inspectors obtained the records, they had no knowledge that anyone but the Boggs family was permanently residing at the apartment. The telephone number for which they requested the billing records was that given to them by the victims' landlord and friends. Although they had reports of another couple temporarily staying with the Boggses, there was no reason for the inspectors to suspect that the telephone subscriber was not Ray or Angie Boggs. The officers requested the Boggses' telephone records. They knew that all members of the Boggs family were dead and reasonably drew the inference that no living person had an expectation of privacy in the billing records. The inspectors had an honest and reasonable belief that a warrant was not necessary to obtain the telephone billing records for the Webster Street apartment. An unreasonable search did not occur here. Suppression was properly denied.

Moreover, contrary to appellant's argument, we do not agree that a warrant should have been obtained once the inspectors saw "Phil W. Hen-

derson" on the telephone bill. The inspectors were aware that Ray Boggs had at least one alias, Ray Martinez. Their assumption that "Phil W. Henderson" was a second alias for the victim was reasonable under the circumstances.

### III

*Challenge to Jury Selection System*

 Prior to their trials, appellants, along with three defendants in other cases, filed a joint challenge to the venire as not representing an impartial body drawn from a fair cross-section of the community. (*Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 271-273 [148 Cal.Rptr. 890, 583 P.2d 748].) The challenge was premised on the ground that the San Francisco jury selection process systematically excludes (1) youths, defined as persons aged 18 to 29; (2) persons with a high school education or less; (3) persons at or below the poverty level; and (4) blue-collar workers. Appellants submit that the trial court's denial of the motion was error. We disagree.

The pertinent facts regarding San Francisco's jury selection procedure were adduced at the consolidated hearing on the matter. The Department of Motor Vehicles and the San Francisco Registrar of Voters each provide San Francisco's electronic data processing department (EDP) with source lists of purported San Francisco residents. After the EDP computer merges the two lists and purges the duplicated names, the resulting source list contains approximately 566,000 names. Thereafter, the San Francisco Jury Commissioner's office (commissioner) sends a letter to EDP requesting that approximately 20,000 names be drawn from the current source list. This master list of 20,000 names is permanently removed from the source list, alphabetized and sent to the commissioner in the form of an electronic tape which is loaded onto the commissioner's computer system.

Approximately once per month the commissioner's computer selects randomly packages of 5,000 names from any unexhausted master list and then from the current master list. No information as to an individual's race, gender or financial status is coded into the computer. Jury questionnaires are sent to each of these 5,000 persons. Questions 1 through 5 are based on the jury competency standards of former Code of Civil Procedure sections 198 and 199, and inquire about understanding of English, citizenship, residency, prior jury service within the preceding 12 months and prior felony convictions. Questions 6 through 9 regard pending criminal charges, dependent care, physical or mental disability and hardship. The returned questionnaires are reviewed by the commissioner's staff.

Prior to July 19, 1984, a person was not placed on the qualified jury list if he or she answered "no" to any of the first five questions or "yes" to questions 6 through 9. However, pursuant to a resolution of the superior court effective on that date, the commissioner may only disqualify persons based upon their answers to questions 1 through 5. Affirmative responses to questions 6 through 9 are referred to the presiding judge who may grant excusal or deferral. The commissioner exercises discretion to follow up if there is a problem with the answers to questions 1 through 5. As of July 1984, a second questionnaire is sent with a summons to those persons who did not respond to the first questionnaire ordering them to either appear personally at the commissioner's office or to complete and return the second questionnaire. After the questionnaires are reviewed and the names of those disqualified, excused or deferred, are removed, the list becomes the qualified pool known as the qualified jury list.

Each week, depending upon how many jurors are needed, the commissioner's computer draws from the qualified list a certain number of names for jury service to begin approximately three weeks later. The computer is programmed to first select the names of the earliest persons qualified and secondarily by alphabetical position. The computer then prints the summons directing the person to appear either at city hall (for civil trials) or the hall of justice (for criminal trials). Those who fail to appear in response to the summons are contacted by telephone or by mail.

Upon their arrival at city hall or the hall of justice, prospective jurors may fill out a form requesting excusal or deferral. The forms are submitted to the court, which may approve or reject the request. From the list of qualified jurors who remain, the commissioner's computer utilizes a random number generator to select the particular number of prospective jurors to be assigned to each trial department in need of a panel.

Appellants presented statistical evidence in support of their contention that youths, persons with a high school education or less, persons at or below the poverty level and blue-collar workers were underrepresented in the March 1984 source pool and/or in the pool of qualified prospective jurors who responded to summons between August and September 1984. Statistics were also presented from January 1984 through March 1985 regarding excusals granted at the questionnaire stage and excusals and deferrals granted by judges once people appeared for jury service.

The validity of the order denying the jury composition challenge was considered by Division Five of the Court of Appeal, First Appellate District in *People* v. *Malcolm* (A039244), in its opinion filed March 30, 1989. Malcolm, one of the defendants who had joined in the pretrial motion below,

presented the identical arguments raised by appellants here. In fact, appellants have incorporated Malcolm's opening brief on this issue. Division Five found no error in the trial court's ruling holding that the four allegedly underrepresented groups failed to constitute "distinctive" or "cognizable" groups for the purpose of establishing a prima facie violation of the fair cross-section requirement. (*People* v. *Malcolm* (Mar. 30, 1989) A039244 [nonpub. opn.].)

We have determined that under the doctrine of collateral estoppel, the appellants are barred from raising the same issue on appeal previously decided by Division Five's opinion in *People* v. *Malcolm*. ■ "Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding].'" (*People* v. *Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321], quoting *People* v. *Taylor* (1974) 12 Cal.3d 686, 691, fn. omitted [117 Cal.Rptr. 70, 527 P.2d 622].)

■ Collateral estoppel effect may be given to an appellate court's opinion deciding a question of law. (*Beckstead* v. *International Industries, Inc.* (1982) 127 Cal.App.3d 927, 934 [179 Cal.Rptr. 767].)

Applying the collateral estoppel test to the opinion in *People* v. *Malcolm*, it is plain appellants may not relitigate the jury composition issue. First, there is no question that the *Malcolm* opinion decided the identical issue raised by appellants here. The appellants in their briefs on the jury composition issue incorporated entirely Malcolm's own brief on the issue. As Malcolm and the appellants, inter alia, had presented the motion for joint consideration in the superior court, the record before Division Five and this division are the same.

Second, Division Five's opinion, affirming the judgment of conviction, is a final judgment on the merits. The opinion clearly decided the jury composition question and the validity of the trial court's denial of the motion. No petition for rehearing or petition for review is pending.

Third, while the appellants were not parties to the *Malcolm* appeal, they were in privity with him on the question at hand. The concept of privity has been described as " '. . . a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel.' [Citations.]" (*People* v. *Sims, supra,* 32 Cal.3d at pp. 486-487.)

■ Whether someone is in privity with the actual parties requires close examination of the circumstances of each case. " '. . . [P]rivity involves a person so identified in interest with another that he represents the *same legal right.*' " (*Zaragosa* v. *Craven* (1949) 33 Cal.2d 315, 318 [202 P.2d 73, 6 A.L.R.2d 461], italics added.) ■ Here, in arguing this question to this court the appellants adopted the precise legal argument presented by Malcolm to Division Five. Further, Malcolm and the appellants jointly presented their challenge to the trial court at the same time in one proceeding, contesting the jury selection system as it then existed.[7] The evidence adduced by Malcolm, the appellants here and the others, was the basis of the appellate record in *People* v. *Malcolm* and the instant consolidated appeals.

In addition to satisfying the three-prong test for application of the doctrine, the instant case exemplifies some of the policy considerations favoring the doctrine. Analysis of the same trial court ruling by two different panels of the reviewing court would only constitute repetitive litigation possibly resulting in inconsistent judgments. (See *People* v. *Taylor, supra,* 12 Cal.3d at p. 695.)

The circumstances here require that collateral estoppel effect be given to the *Malcolm* opinion.

*Philip Henderson's Renewed Jury Composition Challenge*

In renewing his challenge on voir dire, Philip Henderson's counsel filed a declaration stating that his examination of one hundred twenty-four jury questionnaires from the panel summoned showed underrepresentation of the four groups previously cited as well as two additional groups, Hispanics and females. The prosecutor opposed the renewed challenge, questioning defense counsel's methodology in determining the Hispanic identity of jurors, when the questionnaire failed to ask such information.

He also argued that defense counsel could not accurately identify whether a juror was at the poverty level or a blue-collar worker as the jurors often did not answer questions as to salary information or classification as blue or white collar. The prosecutor submitted that defense counsel's statistics were based on subjective criteria. The motion was again denied.

■ We have determined Philip Henderson failed to meet his burden of establishing a prima facie violation of the fair cross-section requirement by his renewed jury composition challenge.

---

[7] At the outset of their joint motion, the parties entered into a stipulation to the effect that: (1) their separately filed motion papers contain identical issues of law and fact; (2) they have engaged in a joint investigation; (3) the motion shall be consolidated for a joint hearing, and (4) all parties will be bound by the court's ruling.

 " 'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' " (*People* v. *Harris* (1984) 36 Cal.3d 36, 50 [201 Cal.Rptr. 782, 679 P.2d 433], cert. den. *sub nom. California* v. *Harris* (1984) 469 U.S. 965 [83 L.Ed.2d 301, 105 S.Ct. 365], quoting *Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587, 99 S.Ct. 664].) Once the defendant establishes a prima facie case the burden shifts to the People to show that with more refined statistics the underrepresentation would be reduced to a constitutionally insignificant disparity, or that there exists a compelling justification for the procedure that results in such underrepresentation. (36 Cal.3d at p. 50.)

In *People* v. *Morales* (1989) 48 Cal.3d 527 [257 Cal.Rptr. 64, 770 P.2d 244], certiorari denied *sub nom. Morales* v. *California* (1989) 493 U.S. __ [107 L.Ed.2d 520, 110 S.Ct. 520], our Supreme Court considered the asserted systematic underrepresentation of Hispanics in Ventura County juries. In support of his challenge, Morales presented evidence that Hispanics were underrepresented on two consecutive sample jury panels. According to his evidence, Hispanics constituted approximately 18 percent of the adult population in the county and yet only 10.71 percent and 8.73 percent reported for jury duty for two consecutive panels. (*People* v. *Morales, supra,* 48 Cal.3d at pp. 541-543.)

The high court concluded a prima facie showing had not been made as the statistical showing based on two consecutive jury panels constituted an inadequate sample. "The sample was too small in size, and too short in duration, to support a finding of unreasonable underrepresentation or systematic exclusion." (48 Cal.3d at pp. 548-549.)

 Similarly, in the instant case, defense counsel's review of 124 jury questionnaires from the combined jury panel was an insufficient basis for Philip Henderson's statistical showing. A legitimate inference of systematic exclusion of a cognizable group cannot be drawn from such evidence.

Further, with respect to the purported underrepresentation of youths, persons with a high school education or less, persons at or below the poverty level and blue-collar workers, we are in accord with Division Five's opinion that a cognizable or distinctive group has not been established.

 In order for there to be improper exclusion of a cognizable group "there must be a common thread" shared by the group, "a basic similarity

of attitudes, ideas or experience among its members so that the exclusion prevents juries from reflecting a cross-section of the community." (*Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 60 [115 Cal.Rptr. 247, 524 P.2d 375].) Groups defined by race, gender or religion constitute a cognizable group. However, decisions are divided on the cognizability of groups defined by age, occupation, economic status, and social status. (*People* v. *Fields* (1983) 35 Cal.3d 329, 347 [197 Cal.Rptr. 803, 673 P.2d 680], cert. den. *sub nom. Fields* v. *California* (1984) 469 U.S. 892 [83 L.Ed.2d 204, 105 S.Ct. 267].)

A two-part test of cognizability was stated in *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93 [154 Cal.Rptr. 734, 593 P.2d 595]. First, the members of the group "must share a common perspective arising from their life experience in the group, i.e., a perspective gained precisely *because* they are members of that group." (*Id.*, at p. 98.) Second, the party alleging the lack of a representative cross-section must also show that "no other members of the community are capable of adequately representing the perspective of the group assertedly excluded." (*Ibid.*) However, the second prong of the test was called into question by the Supreme Court in *Harris*. (*People* v. *Harris*, *supra*, 36 Cal.3d at p. 51, fn. 5.) Additionally, we note that cognizability is a question of fact for the trial court. (*Hernandez* v. *Texas* (1954) 347 U.S. 475, 478 [98 L.Ed. 866, 870, 74 S.Ct. 667].)

■ Young people do not constitute a cognizable class for purposes of the cross-section rule. (See *People* v. *McGhee* (1987) 193 Cal.App.3d 1333, 1349, 1351-1352 [239 Cal.Rptr. 28] [young people]; *People* v. *Marbley* (1986) 181 Cal.App.3d 45, 47-48 [225 Cal.Rptr. 918] [ages 18-28]; *People* v. *Parras* (1984) 159 Cal.App.3d 875, 877 [205 Cal.Rptr. 766] [younger people]; *People* v. *Estrada* (1979) 93 Cal.App.3d 76, 93 [155 Cal.Rptr. 731] [ages 18-29].) Numerous cases from other courts are in accord. (*People* v. *Hoiland* (1971) 22 Cal.App.3d 530, 539-540 [99 Cal.Rptr. 523] [ages 21-30]; *United States* v. *Kleifgen* (9th Cir. 1977) 557 F.2d 1293, 1296 [young people]; *United States* v. *Potter* (9th Cir. 1977) 552 F.2d 901, 905 [ages 18-34]; *United States* v. *Ross* (9th Cir. 1972) 468 F.2d 1213, 1216-1217 [ages 21-24], cert. den. *sub nom. Ross* v. *United States* (1973) 410 U.S. 989 [36 L.Ed.2d 188, 93 S.Ct. 1500]; *People* v. *Navarette* (1976) 54 Cal.App.3d 1064, 1077 [127 Cal.Rptr. 55].) Neither do blue-collar workers or poor persons (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1214 [255 Cal.Rptr. 569, 767 P.2d 1047], cert. den. *sub nom. Johnson* v. *California* (1989) __ U.S. __ [108 L.Ed.2d 636, 110 S.Ct. 1501]) constitute cognizable groups.

Defense testimony at the hearing on the jury composition challenge as to the cognizability of the less-educated did not establish the cohesiveness of this group. The defense sociologist testified that people with a high school education or less are more traditional, feel inferior to those with a college

education, and are more inclined to be sympathetic to the criminal justice system. However, the sociologist also admitted that the difference between one year of college and completion of high school was not that significant and that sociologists prefer a more detailed educational breakdown than the one proffered by appellant, which compares high school or less with the more than high school category. He stated that not only did those with a high school education constitute a distinct group, but so did those with an eighth grade education or less. Federal cases which have considered the question, have concluded the less educated do not constitute a cognizable group. (See *United States* v. *Potter, supra*, 552 F.2d at p. 905; *United States* v. *Kleifgen, supra*, 557 F.2d at p. 1296; see also *People* v. *Estrada, supra*, 93 Cal.App.3d at pp. 90-91.)

Philip's renewed challenge, like the original challenge, did not meet the burden of showing that youths, persons with less than a high school education, persons at or below the poverty level, and blue-collar workers constituted cognizable groups. Additionally, as to Hispanics and women, as well as the four purported groups, a review of the 124 questionnaires is an insufficient basis from which to make the challenge. The renewed challenge was properly denied.

IV*

. . . . . . . . . . . . . . . . . . . . . .

V

Philip's next contention is that there is insufficient evidence to support his two first degree murder convictions either on a felony-murder theory or on a premeditated and deliberate theory. We have determined there is sufficient evidence of guilt on these two convictions under the felony-murder theory.

█ " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], citing *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) In reviewing the sufficiency of the evidence, the appellate court must view the evidence in the light most favorable to the respondent, presuming in support of the judgment every fact which the trier

---

*See footnote, *ante*, page 1129.

could reasonably deduce from the record. The court must first resolve the issue in light of the whole record, not simply the evidence selected by the respondent. Second, the court must evaluate the substantiality of each of the essential elements. (26 Cal.3d at pp. 576-577; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781], rehg. den. (1979) 444 U.S. 890 [62 L.Ed.2d 126, 100 S.Ct.195].)

*Felony Murder*

■■■■ Philip contends that the evidence of the robbery in this case is insufficient to sustain either of the two first degree murder convictions on a felony-murder theory or the two robbery-murder special circumstances.

■■■■ Under the felony-murder rule "the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death . . . ." (*People* v. *Anderson* (1968) 70 Cal.2d 15, 34 [73 Cal.Rptr. 550, 447 P.2d 942].) An intent to rob will not support a conviction of felony murder if it arose after the infliction of the fatal wound. (*People* v. *Morris* (1988) 46 Cal.3d 1, 23, fn. 9 [249 Cal.Rptr. 119, 756 P.2d 843] citing *People* v. *Green* (1980) 27 Cal.3d 1, 54, fn. 44 [164 Cal.Rptr. 1, 609 P.2d 468].) ■■■■ Philip submits that the record here cannot establish that he harbored the felonious intent prior to or during the acts of force against the victims. We disagree.

From the evidence a reasonable trier of fact could have drawn the inference that Philip had formed the intent to steal prior to the killings. Contrary to Philip's contention, it was not speculation for the jury to conclude that robbery was in fact the motive for the murders of Ray and Angie Boggs. Philip and Velma wanted to return to Florida and had no means to do it. In his own testimony, Philip admitted that he and his wife had no money so they decided to steal the Boggses' property, including Ray's rifle, his truck, the parrot, and Angie's jewelry. That the intent to steal was formed prior to the killings is established by Philip's testimony that they had decided before Christmas to go back to Florida, that they had no transportation and that stealing Ray's truck was their only means of transportation. Additionally, the prosecution evidence clearly showed the appellants' flight across country, during which some of the stolen property was sold. Further, it was reasonable for the jury to conclude that the Hendersons stole Ray's rifle and the clips *prior* to shooting him. The rifle typically hung on the apartment wall. Ray Boggs's body had been found hog-tied with one bullet wound to his head. The ballistics evidence was consistent with the conclusion that the bullet retrieved from his body came from Ray's .22-caliber rifle.

For purposes of first degree felony murder, a homicide is committed in the perpetration of the felony if the killing and the felony are parts of one continuous transaction. (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017], cert. den. *sub nom. Ainsworth* v. *California* (1989) 488 U.S. 1050 [102 L.Ed.2d 1006, 109 S.Ct. 883].) Here, substantial evidence supports the jury's finding that killing of Ray and Angie Boggs had occurred during the course of the robbery of their property.

*Robbery-murder Special Circumstance*

In order for a robbery-murder special circumstance to be proven, the jury must find that the murder was committed during the commission or the attempted commission of the robbery. (§ 190.2, subd. (a)(17)(i); see *People* v. *Morris*, *supra*, 46 Cal.3d at p. 19.) A robbery conviction cannot be sustained in the absence of evidence that the defendant formed the intent to steal prior to committing the act of force against the victim. (*Ibid.*, citing *People* v. *Green*, *supra*, 27 Cal.3d at pp. 52-54.) Philip submits there is insufficient evidence of the robbery as no evidence showed that the theft had occurred by force or fear. Further, he argues there is no substantial evidence that the murders occurred during the commission of the robbery. We find no merit in this argument.

First, we have already determined that there was sufficient evidence from which a reasonable trier of fact could conclude that Philip had conceived the intent to steal before committing a forceful act against the victims. Moreover, there is substantial evidence in the record that the murders occurred during the commission of the robbery.

The opinion of *People* v. *Morris*, *supra*, 46 Cal.3d at pages 19-22, relied upon by Philip, is factually distinguishable from the case at bench. *Morris* reversed a special circumstance finding of robbery murder on the basis of insufficiency of the evidence. In *Morris*, the victim's almost nude body was found within minutes of the shooting. There was no evidence that any personal property was in his possession at the time of the shooting. The sole evidence that even a theft had occurred was based on one witness's testimony that a credit card, formerly in the victim's possession, was in the defendant's possession three days after the homicide. In contrast, in the instant case we have Philip's own testimony that Velma and he committed the theft. In addition there is sufficient circumstantial evidence from which the jury could conclude that the murder was committed during the commission of the robbery.

As we have determined the sufficiency of the evidence of the two first degree murder convictions based on a felony-murder theory, we need not

address Philip's remaining contention that the convictions must be reversed for insufficient proof of premeditation and deliberation. Based on the jury's findings that two robbery-murder special circumstance allegations were true, we can conclude that the jurors agreed at least on the felony-murder theory in convicting Philip of the two murder charges. (See *People* v. *Hernandez* (1988) 47 Cal.3d 315, 351, cert. den. *sub nom. Hernandez* v. *California* (1989) 491 U.S. 910 [105 L.Ed.2d 709, 109 S.Ct. 3201]; *People* v. *Ainsworth, supra,* 45 Cal.3d at pp. 1015-1016; *People* v. *Memro* (1985) 38 Cal.3d 658, 695, 700 [214 Cal.Rptr. 832, 700 P.2d 446].) No further inquiry is needed.

## VI*

. . . . . . . . . . . . . . . . . . . . .

## VII

■ The next argument raised by Philip is that his second degree murder conviction for the killing of the fetus must be reversed as section 187 is void for vagueness. This statute defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought." The "fetus" described in the statute means only a "viable" fetus. (*People* v. *Smith* (1976) 59 Cal.App.3d 751, 757 [129 Cal.Rptr. 498].) Specifically, Philip contends that the concept of a "viable fetus" is so vague that it fails to provide notice to a perpetrator that his or her violent act may be prohibited by this statute.

■ A statute that requires or prohibits an act in terms so vague that persons of common intelligence must guess at its meaning and could differ as to its application, fails to give fair notice as to the forbidden conduct and thereby deprives an individual of due process of law. (*People* v. *Apodaca* (1978) 76 Cal.App.3d 479, 486 [142 Cal.Rptr. 830] .) However, no more than a reasonable degree of certainty is required in criminal statutes. (*Id.,* at p. 486, citing *Boyce Motor Lines* v. *United States* (1952) 342 U.S. 337, 340 [96 L.Ed. 367, 72 S.Ct. 329].)

■ The statute at issue here does not violate due process principles. While the concept of viability is a subject of great discussion in the national debate over abortion, in the context of this statute it is well established. (See *People* v. *Smith* (1987) 188 Cal.App.3d 1495, 1514 [234 Cal.Rptr. 142], cert. den. *sub nom. Smith* v. *California* (1987) 484 U.S. 866 [98 L.Ed.2d 140, 108 S.Ct. 188].) "A fetus is viable when it has achieved the capability for independent existence . . . [i.e.,] when it is possible for it to survive the trauma

---

*See footnote, *ante,* page 1129.

of birth, although with artificial medical aid." (*People* v. *Apodaca, supra*, 76 Cal.App.3d at pp. 489-490; see also *People* v. *Smith, supra*, 59 Cal.App.3d at pp. 758-759.)

"Section 187 gives all persons of common intelligence ample warning that an assault on a pregnant woman without her consent for the purpose of unlawfully killing her unborn child can constitute the crime of murder." (*People* v. *Apodaca, supra*, 76 Cal.App.3d at p. 486.) That fetus viability may be a question of fact, dependent upon the circumstances of the individual case, does not render the statute void for vagueness. Criminal statutes are resplendent with elements containing factual questions dependent upon the particular facts of the case. What we are concerned with here is whether an individual of common intelligence would recognize that his or her conduct is prohibited by section 187. We have determined the statute provides ample notice.

*Colautti* v. *Franklin* (1979) 439 U.S. 379 [58 L.Ed.2d 596, 99 S.Ct. 675], cited by Philip, provides no support for his position. In *Colautti*, the United States Supreme Court held that the Pennsylvania Abortion Control Act's requirement of a viability determination was void for vagueness. The statute in question there requires every person who performs an abortion to make a determination based on his or her "'. . . experience, judgment or professional competence'" that the fetus is not viable. If the fetus is viable or if "'there is sufficient reason to believe that the fetus *may be viable*'" the individual making the determination must adhere to a prescribed standard of care. (*Id.*, at p. 391 [58 L.Ed.2d at p. 606, italics added.) The court held that viability-determination requirement was doubly ambiguous. It was unclear whether the statute imposed a subjective standard for the determination or whether it imposed a mixed subjective and objective standard. Further, the *Colautti* court found it unclear whether the phrase "may be viable" referred to the viability definition in *Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705], and *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52 [49 L.Ed.2d 788, 96 S.Ct. 2831], or whether it referred to the "'gray'" time period prior to the stage of viability. (*Colautti, supra*, 439 at p. 391 [58 L.Ed.2d at pp. 606-607].) The court found the vagueness of the viability requirement was compounded by the fact that the statute imposed criminal liability upon the physician without regard to fault. (*Colautti* v. *Franklin, supra*, 439 U.S. at p. 394 [58 L.Ed.2d at p. 608].)

The statute here contains none of these ambiguities. In fact, the statute itself makes no reference whatsoever to viability. It is decisional law interpreting section 187 which limits the criminal liability for its violation to viable fetuses. *Colautti* has no application to our construction of section 187.

## VIII

 Velma argues that the trial court erroneously denied suppression of a taped statement she made to the inspectors following her arrest in Florida. She charges the statement was taken in violation of her Sixth Amendment right to counsel, as well as her rights under article I, section 15 of the California Constitution. Velma concedes she was advised of her *Miranda* rights prior to the interview and that she agreed to waive such rights in speaking to the inspectors. However, she charges that the waiver she made prior to her interview was ineffective in view of the fact that she had not been informed that a complaint for multiple murders had already been filed against her. We find no error in the admission of her statement.

Although she raised no objection to the admission of her statement at trial, Velma now claims reversible error as a result of the trial court's denial of her section 1538.5 motion to suppress the statement she made to the police following her arrest and prior to her arraignment. Velma was arrested in Florida pursuant to an arrest warrant issued in California after a complaint was filed. After her arrest she was read her *Miranda* rights and asked if she wished to talk to Inspectors Hendrix and Sanders. She agreed to do so.

At the section 1538.5 hearing it was Velma's contention that, once a complaint is filed, any statement deliberately elicited from an accused by police in absence of counsel is per se inadmissible, and the accused acquires an absolute, unwaivable right under the Sixth Amendment to the presence of counsel at any subsequent police interrogation. Velma cites as the landmark case in support of her position the Supreme Court decision in *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. However, Velma's reliance on *Massiah* is misplaced.

*Massiah* concerned the admissibility of statements taken from an individual by surreptitious means and in the absence of counsel after he had been indicted, obtained an attorney and entered a not guilty plea. The United States Supreme Court held that incriminating statements deliberately taken in this manner, without the defendant's knowledge and without the presence of the defendant's attorney, deprived him of his Sixth Amendment right to counsel.

In the instant case, Velma's statements were not elicited by trickery or deception. She was fully aware that her statement was being recorded. As she had been advised of her *Miranda* rights, Velma also realized that any statement she made might be used against her in court. She had waived her right to the presence of counsel and had not retained or received appointed

counsel at the time her statement was recorded. Neither had she appeared in court. *Massiah* emphasized the critical importance of the right to counsel during the time period after arraignment and before commencement of trial. ▆▆ Statements secretly obtained from a defendant during this time period without counsel is a violation of the Sixth Amendment. It is clear that *Massiah* does not control the case at bench.

▆▆ When a complaint has been filed and an arrest has been made and the accused is not represented by counsel, there is no absolute prohibition against the police eliciting a statement from the accused so long as the waiver of the right to have counsel present is free and voluntary. In an effort to avoid the application of this proposition in the case at bench, Velma cites two California cases, *People* v. *Lebell* (1979) 89 Cal.App.3d 772 [152 Cal.Rptr. 840], and *People* v. *Engert* (1987) 193 Cal.App.3d 1518 [239 Cal.Rptr. 169]. However, these cases are readily distinguishable from the instant case.

*Lebell* involved the admissibility of a taped statement taken from a murder suspect when he did not know that he was being interrogated, that the conversation was being taped or that the individual who was wired with the recording device was acting as an agent for the police. The suspect had also not been advised of his right to counsel prior to the time the statement was obtained. The *Lebell* court found the defendant's Sixth Amendment right to counsel had been violated as the statement was taken at a time when the defendant had become the focus of police suspicion and a complaint had been filed charging him with the commission of the crime. The Court of Appeal ruled that the defendant was entitled to the assistance of counsel before the conversation took place.

The instant case contrasts with *Lebell* on two significant points. First, unlike *Lebell*, Velma was advised of her right to counsel immediately before she gave her statement and voluntarily waived such right. Second, the statement was not elicited by any surreptitious means. Velma fully realized that the officers who arrested and questioned her were San Francisco homicide inspectors investigating the Boggs murder case.

Neither is Velma's reliance on *People* v. *Engert, supra,* 193 Cal.App.3d 1518, well founded. The *Engert* court considered the admissibility of a defendant's statement when the defendant had not been informed by police of the fact of his arrest, or that a complaint for murder had been filed against him. In *Engert*, the police led the defendant to believe he was not even a suspect in the murder case. The Court of Appeal held the statement was taken in violation of his Sixth Amendment right to counsel and that the police conduct of misrepresenting the fact of his arrest and the filing of a

complaint against him precluded a knowing waiver of that right. (*People* v. *Engert, supra,* 193 Cal.App.3d at pp. 1523, 1525-1527.) "[W]e conclude that there can be no valid Sixth Amendment waiver of the right to counsel unless a defendant is informed, or it is otherwise established that he was aware, of his arrest or that charges have been filed against him." (*Id.,* at p. 1526.)

In the first instance, *Engert*'s specific holding does not aid Velma here as the circumstances of this case demonstrate that she recognized the fact of her arrest and that she had become a focus of suspicion in the Boggs murder case. Moreover, Velma did not give her statement as a result of any trickery of deceptive means used by the police. Her knowing Sixth Amendment waiver was not vitiated by any police misrepresentation.

The fact that she may not have known that a complaint had been filed is of no significance in this case as she knew that the Boggses had been murdered, that she was under arrest and that Inspectors Hendrix and Sanders were homicide inspectors with the San Francisco Police Department. The waiver of her Sixth Amendment rights to counsel at the outset of her recorded statement was a valid and knowing waiver. The statement was properly admitted into evidence at trial.

IX*

. . . . . . . . . . . . . . . . . . . . . . .

X

The judgments are affirmed.

White, P. J., and Strankman, J., concurred.

A petition for a rehearing was denied December 26, 1990, and December 27, 1990, and appellant's petitions for review by the Supreme Court were denied February 21, 1991.

---

*See footnote, *ante*, page 1129.